**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| POWER RESTORATION INTERNATIONAL, INC., <br><br>                Plaintiff, <br><br>     v. <br><br> PEPSICO, INC., BOTTLING GROUP, LLC, and FRITO-LAY TRADING COMPANY (Europe), Gmbh, <br><br>                Defendants. | CIVIL ACTION NO. _____ <br><br> JURY TRIAL DEMANDED |

### COMPLAINT

1.     Plaintiff, Power Restoration International, Inc. ("PRI") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 104 N. Malin Road, Broomall, Pennsylvania 19008.

2.     PRI is engaged in the business of designing and installing industrial and commercial electrical systems that allow customers to reduce electrical consumption and thereby realize cost savings and increase the longevity of electrically powered equipment.

3.     Defendant Pepsico, Inc. ("Pepsico") is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business located at 700 Anderson Hill Road, Purchase, New York, 10577.

4.     Pepsico is a publicly traded, multinational corporation that, through its subsidiaries, engages in, among other things, the manufacture, sale, and distribution of beverages and food products in the United States and abroad.

1

5.      Defendant, Bottling Group, LLC ("Bottling Group") is believed to be a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at One Pepsi Way, Somers, New York 10589.

6.      Bottling Group is believed to be either wholly owned or controlled by Pepsico, the successor in interest to Pepsi Bottling Group, LLC, and therefore solely responsible for the liabilities of Pepsi Bottling Group, LLC as set forth herein.

7.      Defendant Frito-Lay Trading Company (Europe), Gmbh ("Frito-Lay"), is believed to be wholly owned or controlled by Pepsico and is a German corporation with a principal place of business in Switzerland.

8.      It is believed, and therefore averred that none of the constituent members of the Bottling Group and Frito-Lay are either incorporated or have a principal place of business in the Commonwealth of Pennsylvania.


**Statement of Jurisdiction**

9.      Jurisdiction is proper in this Judicial District pursuant to 28 U.S.C. § 1332, as there exists complete diversity of parties.  PRI has a corporate residence and principal place of business in this Commonwealth, and each defendant's corporate residence and principal place of business, as well as that of their constituent members, are in States or Commonwealths other than Pennsylvania.

10.      Venue is proper under 28 U.S.C. §1391, as the defendants are subject to personal jurisdiction in this Judicial District.

## Statement of Facts

11.    Prior to the Fall of 2010 Pepsico decided to implement a companywide program that would enable Pepsico to better manage, control, and optimize Pepsico's electrical power consumption at manufacturing, operational and maintenance facilities worldwide.

12.    Pepsico senior management deemed the development and implementation of the program the single most important productivity and sustainability program within Pepsico.

13.    Pepsico senior management intended that the program would be announced in their 2010 annual report as an innovative sustainability and productivity initiative, with the timing of its implementation following Pepsico's second quarter financial results.

14.    Pepsico senior management had budgeted and approved capital to do 100 plants globally in calendar year 2011.

15.    In August of 2010 Pepsico contacted PRI for the purposes of developing the program which was designated as the Global Power Optimization Program.  At this time Pepsico entered into an oral contract with PRI whereby PRI was to act as the engineering/program management entity for coordinating all facets of this Global Power Optimization program.

16.     From August of 2010 and continuing through March of 2011 PRI representatives met with Pepsico senior management and worked tirelessly to develop and establish the Global Power Optimization Program.

17.    On February 15, 2011 Pepsico confirmed its retention of PRI with the issuance of a the following letter of intent:

> This letter sets forth the intent of Pepsico, Inc. with regard to PRI Global Enterprises to procure, over the next 12 months, Power Quality Solutions to be installed at Pepsico facilities located in multiple countries. Pepsico intends to conduct at least 150 audits of these facilities. Pepsico anticipates most of these audits will deliver favorable ROI. Further, it is Pepsico's intent to issue 100 Orders to PRI Global Enterprises for design and installation during this period, with an average cost of $300,000 per installation.

3

18.     As a preliminary step in implementing the Global Power Optimization Program, in or about January of 2011, Pepsico, Pepsi Bottling Group, LLC and Frito Lay directed PRI to perform energy audits in advance of the installation of its power savings systems at multiple domestic and international Pepsico facilities. As part of this directive, PRI was to be paid for labor, materials, equipment, subcontractor work, and expenses required to perform the audits.

19.     Pursuant to directive, PRI performed audits at Pepsico facilities in Iberia, Poland and Turkey in February of 2011 and issued an invoice dated May 27, 2011 to Pepsico and Frito Lay in the amount of $101,267.00.  A true and correct copy of this invoice is attached hereto as Exhibit "A."

20.     In addition to performing audits, Bottling Group and PRI entered into written purchase order contracts calling for the installation of power savings systems in Pepsico facilities located in Hayward, California and Stone Mountain, Georgia.  True and correct copies of these purchase order agreements are collectively attached hereto as Exhibit "B."

21.     Separately from the Hayward and Stone Mountain purchase order agreements, Bottling Group also entered into a written agreement with PRI for identical work to be performed at Pepsico's facility in Mississagua, Canada. True and correct copies of the January 31, 2011 proposal from PRI and March 28, 2011 e-mail accepting the proposal are attached hereto as Exhibit "C."

22.     PRI performed the services required under the purchase orders, and as reflected in an issued invoice dated November 1, 2011, there remains due and owing to PRI from the Bottling Group $59,905.25 for work performed.  A true and correct copy of this invoice is attached hereto as Exhibit "D."

4

23.     On May 27, 2011 Pepsico wrongfully and unjustifiably terminated its contract with PRI.

24.     At the time of termination, PRI reasonably expected to be paid for the invoices set forth above, as well as to move forward with the Global Optimization Program and thereby realize an estimated $9 million in profit.

25.     Despite repeated demands for payment, the Bottling Group has refused and continues to refuse to pay PRI the total amount of $161,172.25 for amounts due under the agreements.

26.     As a direct and proximate result of Pepsico's wrongful and unjustifiable termination of PRI's contract, and failure to make payments as set forth above, PRI has been damaged in an amount in excess of $9,161,172.25, representing contract balances, lost profit, damage to reputation, and business interruption.

27.     All conditions precedent to PRI's right to the relief sought herein have been performed, or have otherwise occurred.


**- COUNT I –**
<u>Breach of Contract</u>

28.     PRI incorporates the foregoing paragraphs as if set forth at length herein.

29.     Defendants agreed to make full and timely payments to PRI as consideration for PRI's performance of the work required under the agreements.

30.     Defendants impliedly agreed to perform the agreements in good faith and with fair dealing toward PRI.

31.     PRI has fully performed its obligations under the agreements.

32.     There is currently due and owing to PRI the presently estimated sum of $9,161,172.25, exclusive of interest and costs.

33.     Defendants' refusals to pay PRI amounts due are material breaches of the agreements as well as the implied duty of good faith and fair dealing, which breaches have proximately caused damages to PRI presently estimated as $9,161,172.25, plus interest and costs.

WHEREFORE, Plaintiff, Power Restoration International, Inc., requests trial by jury and that this Honorable Court enter judgment in its favor and against Defendant Bottling Group, LLC, in the amount of $59,905.25, and against Defendants Frito-Lay Trading Company (Europe), Gmbh and Pepsico, Inc., jointly and severally, in the amount of $101,267.00, and all defendants in the amount of $9,000,000 for lost profits, together with damages relating to lost reputation and business interruption, together with interest and costs and such other relief as this Honorable Court deems necessary or appropriate.


**- COUNT II -**
Unjust Enrichment
(in the alternative)

34.     PRI incorporates the preceding paragraphs as if set forth at length herein.

35.     PRI provided services at the request of Defendants, fully expecting compensation from Defendants for such services.

36.     Defendants failed to pay PRI for the services requested.

37.     Defendants have enjoyed the benefits of the services provided by PRI.

38.     Defendants' retention of the benefits provided by PRI without compensating PRI for such work would be unjust.

39.     The reasonable value of the unpaid services is $161,172.25, exclusive of interest and costs.

WHEREFORE, Plaintiff, Power Restoration International, Inc., requests trial by jury and that this Honorable Court enter judgment in its favor and against Defendant Bottling Group, LLC, in the amount of $59,905.25, and against Defendants Frito-Lay Trading Company (Europe), Gmbh and Pepsico, Inc., jointly and severally, in the amount of $101,267.00, together with interest and costs and such other relief as this Honorable Court deems necessary or appropriate.

**- COUNT III -**
Quantum Meruit
(in the alternative)

40.     PRI incorporates the preceding paragraphs as if set forth at length herein.

41.     Defendants have received the benefit of the services provided by PRI.

42.     PRI is entitled to the *quantum meruit* value of the services provided to Defendants in connection with the agreements for which it has not been paid.

43.     The *quantum meruit* value of the services provided by PRI to Defendants in performing work pursuant to the agreements for which PRI has not been paid is $161,172.25, exclusive of interest and costs.

WHEREFORE, Plaintiff, Power Restoration International, Inc., requests trial by jury and that this Honorable Court enter judgment in its favor and against Defendant Bottling Group, LLC, in the amount of $59,905.25, and against Defendants Frito-Lay Trading Company (Europe), Gmbh and Pepsico, Inc., jointly and severally, in the amount of $101,267.00, together with interest and costs and such other relief as this Honorable Court deems necessary or appropriate.

## - COUNT IV -
### Account Stated

44.     PRI incorporates the foregoing paragraphs as if set forth at length herein.

45.     PRI has maintained an accurate and running account of all debits and credits for the services provided to Defendants pursuant to the agreements.

46.     PRI has issued periodic statements of account for the services provided to Defendants.

47.     PRI submitted to Defendants a written account accurately showing all debits and credits to Defendants account.

48.     The account stated includes all of the invoices detailed in this Complaint, which are incorporated herein by reference.

49.     Defendants have not paid PRI for the services which PRI provided upon Defendants' request.

50.     Defendants have had an opportunity to review the invoices which were sent by PRI.

51.     Defendants did not object to or reject the amounts sought in the invoices issued and the written account stated until litigation was threatened, well after the services were performed.

52.     By failing to object to the account provided by PRI until well after the services were performed and accounts were stated, Defendants have acquiesced and agreed that the account stated is true and correct and that Defendants are indebted to PRI in the sum of $161,172.25, the amount shown in the account as due and owing.

53.     Although demand has been made, Defendants have failed to pay any part of the sum of $161,172.25.

WHEREFORE, Plaintiff, Power Restoration International, Inc., requests trial by jury and that this Honorable Court enter judgment in its favor and against Defendant Bottling Group, LLC, in the amount of $59,905.25, and against Defendants Frito-Lay Trading Company (Europe), Gmbh and Pepsico, Inc., jointly and severally, in the amount of $101,267.00, together with interest and costs and such other relief as this Honorable Court deems necessary or appropriate.

**HALBERSTADT CURLEY, LLC**

Date: <u>April 12, 2012</u>                By: _____

Kevin B. Watson/Pa. ID No. 46743
Melissa A. Simola/Pa. ID No. 208903
1100 E. Hector Street, Suite 425
Conshohocken, PA  19428
Tel: 610.834.8819
kwatson@halcur.com
msimola@halcur.com

*Attorneys for Plaintiff*
*Power Restoration International, Inc.*



**PRI**

# Invoice
Pepsi Euro. 11-001

## Power Restoration International
*"Restoring Quality Back Into Power"*

**P.O. #**
DATE: MAY 27, 2011

104 N. Malin Road
Broomall, PA 19008
Phone 610-353-2018 Fax 610-353-0518
www.global-pri.com

**TO**  Pepsico
Frito-Lay Trading Company (Global)
Gmbh Spitalgasse 2
3011 Bern, Switzerland

**JOB:** Requested / Performed  European audit
program discovery process 2/12/11 –
2/26/11
Iberia, Poland, Turkey

| QUANITY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| | Travel and expenses | 31,542.00 | 31,542.00 |
| | Material and Equipment | 11,321.00 | 11,321.00 |
| | Electrical contractor labor | 14,853.00 | 14,853.00 |
| | PRI labor ( 2 technicians – 14 days each) | 26,600.00 | 26,600.00 |
| | Euro. Telecom | 3,742.00 | 3,742.00 |
| | *Sub Total* | 88,058.00 | 88,058.00 |
| | PRI P/O | 13,209.00 | 13,209.00 |
| | *Sub Total* | 101,267.00 | 101,267.00 |
| | | | |
| | **Terms: Upon Receipt** | | |

| | | |
|---|---|---|
| **THANK YOU FOR YOUR BUSINESS!** | SUBTOTAL | 101,267.00 |
| | SALES TAX | |
| | TOTAL | *101,267.00* |

Make all checks payable to Power Restoration International
**THANK YOU FOR YOUR BUSINESS!**



EXHIBIT
A

**PLEASE MARK THE ORDER NUMBER ON ALL PACKAGES & DOCUMENTS**

| Bottling Group, LLC | 580419701 | Date 3/02/2011 | Page 1 of 2 |
|---|---|---|---|

| Originator | Supplier |
|---|---|
| GREENE, LINDSEY<br>Stone Mountain GA<br>1644 Rock Mountain Blvd<br>Stone Mountain, GA  30083<br>999-999-9999          Email: | 1436572 - POWER RESTORATION INTERNATION/<br>128 BEECHTREE DR<br>BROOMALL, PA  19008<br>ROBERT FAB   610-500-4163 |

| Bill To / Charge To | Ship To |
|---|---|
| GREENE, LINDSEY<br>Stone Mountain GA<br>1644 Rock Mountain Blvd<br>Stone Mountain, GA  30083<br>999-999-9999          Email: | Stone Mountain GA<br>1644 Rock Mountain Blvd<br>Stone Mountain, GA  30083 |

| Payment Terms: | Payment will be made 37 days after FULL receipt of goods |
|---|---|

**Shipping Terms:**

FOB: Origin          Ship Via:  Not Applicable          Project #:    30450

☐ Advance Shipping Notice Required          If Yes, Contact:  n/a

Required Delivery Date:  5/01/2011     Time: 12:00 AM

1 Power Quality System installation as per the submitted pro
posal for the Stone Mountain Facility.
and partial payment for performance of audit program.
The payment schedule as per the approved roll out program sh
ould be as follows:
Net payment 37 days upon invoice
40% due upon receipt of PO.
20% due upon completion of detailed system design
30% due upon start of installation
10% upon successful start up and acceptance by plant

| Line | Description | Quantity | UOM | Unit Price | Extended Price | Tax |
|---|---|---|---|---|---|---|
| 1 14141 - INITIAL PAYMENT | | 1.00 | EA | $104,655.60 | $104,655.60 | ☐ |
| 2 14141 - COMPLETION OF DETAILED SYS DESIGN | | 1.00 | EA | $52,327.80 | $52,327.80 | ☐ |
| 3 14141 - START OF INSTALLATION | | 1.00 | EA | $78,491.70 | $78,491.70 | ☐ |
| 4 14141 - START UP COMPLETE / PLANT ACCEPTED | | 1.00 | EA | $26,163.90 | $26,163.90 | ☐ |

EXHIBIT
B

| | | | |
|---|---|---|---|
| Freight | $0.00 | Sub Total | $261,639.00 |
| EPD (0%) | $0.00 | EPD (0%) | $0.00 |
| Disc. Freight | $0.00 | Supplier Tax | $0.00 |
| Freight Tax | $0.00 | Order Total | $261,639.00 |
| Accrued Tax | $0.00 | Supplier Total | $261,639.00 |

Seller's acknowledgement of this Purchase Order or shipment of products described herein will constitute acceptance of Bottling Group, LLC Terms and Conditions
attached to this Purchase Order.

# Order # 580419701, Page 2 of 2
## Terms and Conditions

1. **Acceptance.**

   Seller's acknowledgment of this Purchase Order or shipment of product described herein ("Product") will constitute acceptance of this Purchase Order. Acceptance is limited to the terms and conditions contained on the face and back hereof, which will constitute the agreement (the "Agreement") between the parties. Any provisions in Seller's acknowledgment which are different from or in addition to these terms and conditions will not be binding upon Purchaser unless Purchaser expressly agrees in writing. If Seller does not object in writing to this Purchase Order and these terms and conditions within three weeks after receipt, Seller will be deemed to have accepted this Purchase Order and the terms and conditions.

2. **Prices.**

   The price set forth in this Agreement is the total amount due from Purchaser for the Product, including duties, taxes and any other charges.  Bottling Group, LLC reserves the right to self-assess the tax rate applied to this Purchase Order to insure the correct tax rate is applied and paid based upon the applicable tax laws and destination of the shipment.  This self-assessment may result in a payment to Seller that differs from the invoiced amount.

3. **Terms of Payment.**

   Unless otherwise stated, payment terms are net 37 days after the later of receipt of invoice or delivery of Product. The time for computing any discount relating to prompt payment will begin on the later of receipt of invoice or delivery of Product.

4. **Shipment and Delivery.**

   The method of transportation, terms of shipment and shipping and delivery dates will be as specified in this Agreement.

5. **Title and Risk of Loss.**

   Regardless of which party pays the costs of shipment and insurance, title and risk of loss will pass to Purchaser at the place of delivery designated by Purchaser.

6. **Warranties.**

   Seller warrants to Purchaser that (a) it has good and marketable title to the Product delivered hereunder (b) the Product at the time of delivery meets the specifications attached hereto or agreed to in writing by both parties, is free from defects and is of merchantable quality and fit for the use intended, and (c) the Product meets all applicable federal, state and local laws, regulations and standards.

7. **Inspection.**

   Payment for the Product delivered hereunder will not constitute acceptance. Purchaser will have the right to inspect the Product and reject any non-conforming Product. At Seller's option, rejected Product may be destroyed or returned to Seller at Seller's expense (including the cost of unpacking, inspecting, repacking and reshipping). Seller will either replace the non-conforming Product or credit Purchaser's account as provided in Paragraph 8.

8. **Replacement or Credit.**

   At Purchaser's request, Seller agrees to replace any non-conforming Product at Seller's expense or to credit Purchaser's account with an amount equal to the amount paid for the non-conforming Product, including any duties and other costs incurred by Purchaser. This remedy is in addition to any other remedies to which Purchaser may be entitled.

9. **Indemnification.**

   Seller will defend, indemnify and hold Purchaser harmless from and against all claims, damages, liabilities and expenses (including reasonable attorney's fees) arising out of or resulting from any breach of warranty hereunder or any tortuous act or omission of Seller, its agents, employees or subcontractors, provided that Purchaser provides Seller with prompt notice of any such claim. Purchaser will defend, indemnify and hold Seller harmless from and against all damages, claims, liabilities and expenses (including reasonable attorney's fees) arising out of or resulting from Purchaser's tortuous act or omission hereunder, provided that Seller provides Purchaser with prompt notice of any such claim.

10. **Force Majeure.**

    Either party's failure to perform its obligations hereunder will be excused to the extent and for the period of time that such non-performance is caused, directly or indirectly, by any act of God, war, strike, boycott, riot, labor dispute, defaults or carriers, governmental act, law restrictions or regulation, or any other cause beyond such party's reasonable control. If due to any such occurrence, Seller is unable to supply the total demand for Product, Seller will allocate its available supply of Product among its customers in a fair and equitable manner.

11. **Compliance With Equal Opportunities Requirements.**

    During the performance of this contract, the Seller agrees as follows:

    (1) The Seller will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Seller will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Seller agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

    (2) The Seller will, in all solicitations or advancements for employees placed by or on behalf of the Seller, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

    (3) The Seller will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the Seller's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

    (4) The Seller will comply with all provisions of Executive Order No. 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

    (5) The Seller will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

    (6) In the event of the Seller's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated, or suspended in whole or in part and the Seller may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

    (7) The Seller will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Seller will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the Seller becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the contractor may request the United States to enter into such litigation to protect the interests of the United States." [Sec. 202 amended by EO 11375 of Oct. 13, 1967, 32 FR 14303, 3 CFR, 1966-1970 Comp., p. 684, EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

    (8) To the extent applicable, Seller will comply with the Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended and Section 503 of the Vocational Rehabilitation Act of 1973 and also agrees that these laws are incorporated herein by this reference.  The contractor also agrees to comply with the provisions of Executive Order 13496 (29 CFR  Part 471), relating to the notice of employee rights under federal labor laws.

12. **Compliance With Occupational Safety & Health Requirement.**

    Seller warrants that the Product delivered to Purchaser pursuant to this Agreement is in compliance with such occupational and health standards as have been promulgated pursuant to the Occupational Safety and Health Act of 1970, 29 U.S.C. § 51, et seq., as amended (the "Act"). If any of the Product delivered to Purchaser is not in compliance with the foregoing standards, Seller agrees to indemnify Purchaser immediately for any fines levied thereon caused by such noncompliance, and for any damages incurred by Purchaser as a result of such noncompliance, and Purchaser reserves the right, in its sole discretion, to cancel, terminate or suspend this Agreement in whole or in part, without liability to Seller.

13. **No Waiver.**

    Failure or delay by either party in exercising any right, power or remedy provided hereunder will not operate as a waiver of any such right, power or remedy. By accepting all or any quantity of Product, Purchaser does not waive its right either to cancel or to return all or any portion of the Product because of failure to conform to this Agreement, latent defects or other breach of warranty, or to make any claim against Seller for any damages suffered by Purchaser.

14. **Status of Parties.**

    The relationship of the parties hereunder will be that of independent contractor and not one of agent, or representative or partner.

15. **Choice of Law.**

    This agreement will be governed by and construed in accordance with the laws of the State of New York.

16. **Assignment.**

    This Agreement will be binding upon and inure to the benefit of the respective successors and assigns of the parties. Neither Purchaser nor Seller will assign its interest under this Agreement without the prior consent of the other party, except to a successor to all or substantially all of its business. Assignment to a successor will not relieve Seller or Purchaser of its primary responsibility under this Agreement. Consent to Assignment will not be unreasonably withheld.

17. **Entire Agreement.**

    This Agreement contains the entire agreements between the parties regarding the subject matter hereof and supersedes all prior agreements, understandings, course of dealings or representations. This Agreement can only be amended by a writing signed by both parties.

**PLEASE MARK THE ORDER NUMBER ON ALL PACKAGES & DOCUMENTS**

| **Bottling Group, LLC** | **764206701** | **Date** 11/16/2010 | **Page** 1 of 2 |
|---|---|---|---|

| Originator | Supplier |
|---|---|
| JAIME, MARIE<br>Hayward CA<br>29000 HESPERIAN BLVD.<br>HAYWARD, CA  94545<br>510-781-3609          Email: joy.jaime@pepsi.com | 1436572 - POWER RESTORATION INTERNATIONA<br>128 BEECHTREE DR<br>BROOMALL, PA  19008<br>ROBERT FAB   610-500-4163 |

| Bill To / Charge To | Ship To |
|---|---|
| JAIME, MARIE<br>Hayward CA<br>29000 HESPERIAN BLVD.<br>HAYWARD, CA  94545<br>510-781-3609          Email: joy.jaime@pepsi.com | Hayward CA<br>29000 HESPERIAN BLVD.<br>HAYWARD, CA  94545 |

| Payment Terms: | **Payment will be made** 37 **days after FULL receipt of goods** |
|---|---|

**Shipping Terms:**

FOB: Origin                    Ship Via:  Not Applicable                              Project #:        29772

☐ Advance Shipping Notice Required                    If Yes, Contact:  n/a

Required Delivery Date:  12/31/2010          Time: 12:00 AM

| Line | Description | Quantity | UOM | Unit Price | Extended Price | Tax |
|---|---|---|---|---|---|---|
| 1 | 14141 - 30% OF TOTAL PROJECT COST | 1.00 | EA | $63,027.00 | $63,027.00 | ☐ |
| 2 | 14141 - 50% OF TOTAL PROJECT COST | 1.00 | EA | $105,045.00 | $105,045.00 | ☐ |
| 3 | 14141 - 20% OF TOTAL PROJECT COST | 1.00 | EA | $42,018.00 | $42,018.00 | ☐ |

| | | | |
|---|---|---|---|
| **Freight** | $0.00 | **Sub Total** | $210,090.00 |
| **EPD (0%)** | $0.00 | **EPD (0%)** | $0.00 |
| **Disc. Freight** | $0.00 | **Supplier Tax** | $0.00 |
| **Freight Tax** | $0.00 | **Order Total** | $210,090.00 |
| **Accrued Tax** | $0.00 | **Supplier Total** | $210,090.00 |
| **Freight** | $0.00 | **Sub Total** | $210,090.00 |
| **EPD (0%)** | $0.00 | **EPD (0%)** | $0.00 |

Seller's acknowledgment of this Purchase Order or shipment of product described herein will constitute acceptance of Bottling Group, LLC Terms and Conditions attached to this Purchase Order.

# Order # 764206701, Page 2 of 2
# Terms and Conditions

1. **Acceptance.**

Seller's acknowledgment of this Purchase Order or shipment of product described herein ("Product") will constitute acceptance of this Purchase Order. Acceptance is limited to the terms and conditions contained on the face and back hereof, which will constitute the agreement (the "Agreement") between the parties. Any provisions in Seller's acknowledgment which are different from or in addition to these terms and conditions will not be binding upon Purchaser unless Purchaser expressly agrees in writing. If Seller does not object in writing to this Purchase Order and these terms and conditions within three weeks after receipt, Seller will be deemed to have accepted this Purchase Order and the terms and conditions.

2. **Prices.**

The price set forth in this Agreement is the total amount due from Purchaser for the Product, including duties, taxes and other charges.  Bottling Group, LLC reserves the right to self-assess the tax rate applied to this Purchase Order to insure the correct tax rate is applied and paid based upon the applicable tax laws and destination of the shipment.  This self-assessment may result in a payment to Seller that differs from the invoiced amount.

3. **Terms of Payment.**

Unless otherwise stated, payment terms are net 37 days after the later of receipt of invoice or delivery of Product. The time for computing any discount relating to prompt payment will begin on the later of receipt of invoice or delivery of Product.

4. **Shipment and Delivery.**

The method of transportation, terms of shipment and shipping and delivery dates will be as specified in this Agreement.

5. **Title and Risk of Loss.**

Regardless of which party pays the costs of shipment and insurance, title and risk of loss will pass to Purchaser at the place of delivery designated by Purchaser.

6. **Warranties.**

Seller warrants to Purchaser that (a) it has good and marketable title to the Product delivered hereunder (b) the Product at the time of delivery meets the specifications attached hereto or agreed to in writing by both parties, is free from defects and is of merchantable quality and fit for the use intended, and (c) the Product meets all applicable federal, state and local laws, regulations and standards.

7. **Inspection.**

Payment for the Product delivered hereunder will not constitute acceptance. Purchaser will have the right to inspect the Product and reject any non-conforming Product. At Seller's option, rejected Product may be destroyed or returned to Seller at Seller's expense (including the cost of unpacking, inspecting, repacking and reshipping). Seller will either replace the non-conforming Product or credit Purchaser's account as provided in Paragraph 8.

8. **Replacement or Credit.**

At Purchaser's request, Seller agrees to replace any non-conforming Product at Seller's expense or to credit Purchaser's account with an amount equal to the amount paid for the non-conforming Product, including any duties and other costs incurred by Purchaser. This remedy is in addition to any other remedies to which Purchaser may be entitled.

9. **Indemnification.**

Seller will defend, indemnify and hold Purchaser harmless from and against all claims, damages, liabilities and expenses (including reasonable attorney's fees) arising out of or resulting from any breach of warranty hereunder or any tortuous act or omission of Seller, its agents, employees or subcontractors, provided that Purchaser provides Seller with prompt notice of any such claim. Purchaser will defend, indemnify and hold Seller harmless from and against all damages, claims, liabilities and expenses (including reasonable attorney's fees) arising out of or resulting from Purchaser's tortuous act or omission hereunder, provided that Seller provides Purchaser with prompt notice of any such claim.

10. **Force Majeure.**

Either party's failure to perform its obligations hereunder will be excused to the extent and for the period of time that such non-performance is caused, directly or indirectly, by any act of God, war, strike, boycott, riot, labor dispute, defaults or carriers, governmental act, law restrictions or regulation, or any other cause beyond such party's reasonable control. If due to any such occurrence, Seller is unable to supply the total demand for Product, Seller will allocate its available supply of Product among its customers in a fair and equitable manner.

11. **Compliance With Equal Opportunities Requirements.**

During the performance of this contract, the Seller agrees as follows:

    (1) The Seller will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Seller will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Seller agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

    (2) The Seller will, in all solicitations or advancements for employees placed by or on behalf of the Seller, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

    (3) The Seller will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the Seller's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

    (4) The Seller will comply with all provisions of Executive Order No. 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

    (5) The Seller will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

    (6) In the event of the Seller's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated, or suspended in whole or in part and the Seller may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

    (7) The Seller will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Seller will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the Seller becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the contractor may request the United States to enter into such litigation to protect the interests of the United States." [Sec. 202 amended by EO 11375 of Oct. 13, 1967, 32 FR 14303, 3 CFR, 1966-1970 Comp., p. 684, EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

    (8) To the extent applicable, Seller will comply with the Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended and Section 503 of the Vocational Rehabilitation Act of 1973 and also agrees that these laws are incorporated herein by this reference.  The contractor also agrees to comply with the provisions of Executive Order 13496 (29 CFR  Part 471), relating to the notice of employee rights under federal labor laws.

12. **Compliance With Occupational Safety & Health Requirement.**

Seller warrants that the Product delivered to Purchaser pursuant to this Agreement is in compliance with such occupational and health standards as have been promulgated pursuant to the Occupational Safety and Health Act of 1970, 29 U.S.C. § 51, et seq., as amended (the "Act"). If any of the Product delivered to Purchaser is not in compliance with the foregoing standards, Seller agrees to indemnify Purchaser immediately for any fines levied thereon caused by such noncompliance, and for any damages incurred by Purchaser as a result of such noncompliance, and Purchaser reserves the right, in its sole discretion, to cancel, terminate or suspend this Agreement in whole or in part, without liability to Seller.

13. **No Waiver.**

Failure or delay by either party in exercising any right, power or remedy provided hereunder will not operate as a waiver of any such right, power or remedy. By accepting all or any quantity of Product, Purchaser does not waive its right either to cancel or to return all or any portion of the Product because of failure to conform to this Agreement, latent defects or other breach of warranty, or to make any claim against Seller for any damages suffered by Purchaser.

14. **Status of Parties.**

The relationship of the parties hereunder will be that of independent contractor and not one of agent, or representative or partner.

15. **Choice of Law.**

This agreement will be governed by and construed in accordance with the laws of the State of New York.

16. **Assignment.**

This Agreement will be binding upon and inure to the benefit of the respective successors and assigns of the parties. Neither Purchaser nor Seller will assign its interest under this Agreement without the prior consent of the other party, except to a successor to all or substantially all of its business. Assignment to a successor will not relieve Seller or Purchaser of its primary responsibility under this Agreement. Consent to Assignment will not be unreasonably withheld.

17. **Entire Agreement.**

This Agreement contains the entire agreements between the parties regarding the subject matter hereof and supersedes all prior agreements, understandings, course of dealings or representations. This Agreement can only be amended by a writing signed by both parties.



**PRI**

Ian Chown
Engineering Manager - Canada
Pepsi Beverages Company
5900 Falbourne Street
Mississauga, ON L5R 3M2, Canada

January 31, 2011

Dear Mr. Chown,

Enclosed with this letter is our revised proposal to install the OptiSine Electrical Power Quality System based off of the audit results of the Mississauga Bottling facility.

This proposal includes but not limited to all labor, material, equipment and insurances required to perform the installation of the above described system.

We will supply and install the items described in the below proposal to assist your facility reduce their energy consumption while providing a cleaner energy solution.

We thank you in advance for considering this proposal and look forward to assisting you reach your energy conservation goals.

Sincerely,

Robert Fabrizio
Vice President- Business Operations
PRI - Americas Strategic Partners

**Supplier Number 1443998**

EXHIBIT
C



**PRI**

Ian Chown
Engineering Manager - Canada
Pepsi Beverages Company
5900 Falbourne Street
Mississauga, ON L5R 3M2, Canada

**Proposal # PBG-CANMis03**

| | |
|---|---:|
| **Proprietary Software and Control Systems**<br>xHQ Software and Configuration<br>WinPM.Net Software V 3.2 SP3, CD New (includes 5 Access meter device licenses)<br>ACCESS Comp. or Modbus Dev. Lic. Limit  1 … 50<br>WinPM.Net OPC Server License<br>WinPM Configuration<br>WinPM Commissioning | $95,696.05 |
| **Metering enclosures, devices, and proprietary hardware**<br>Pre-Assembled PAC Meter Encl, NEMA1 Type, ModbusTCP<br>Enclosure 10 Amp Breaker<br>1000A  2.45"x5.50" Window    5A Output<br>1200A  2.45"x5.50" Window    5A Output<br>1600A  2.45"x5.50" Window    5A Output<br>2000A  2.45"x5.50" Window    5A Output<br>Meter Configuration | Included |
| **Power Filters Hardware**<br>1 - IP54, 400 VAC, 100 Amp AHF<br>Fuse for 100 400 4 - type gL / gG<br>Fuser Holder and Enclosure<br>Fuse Holder Enclosure Assembly | $17,952.62 |
| **Installation of Filters, Metering, Control System, and Software** | $33,000.00 |
| **Power Quality Audit Cost** | $3,000.00 |
| **Drop Material**<br>**Labor**<br>**Installation Supervision** | Included |
| **Subtotal** | $149,648.67 |
| **Pepsi Corporate Discount- 40%** | -($59,859.47) |
| **Audit Refund** | ($3,000.00) |
| **Total** | $86,789.20 |

**Supplier Number 1443998**



**PRI**

January 31, 2011

**Proposal # PBG-CANMis03**

**Estimated Savings**
**T2**

| kW Power Total | 1435 |
|---|---|
| % Potential Savings | 1.30% |
| Harmonic Filter Rating | None |
| Active Filter type | None |

| kVA | kW | kvar | PF |
|---|---|---|---|
| 1522 | 1435 | 493.6 | 0.94 |

| Target Power Factor | 0.98 |
|---|---|
| Required PFC | 260 kvar |

**Potential Estimated Savings T2**
No Harmonic Filter installation on T2
Power Factor Correction Installation recommended on T2

**Estimated Savings**
**T4**

| kW Power Total | 680.5 |
|---|---|
| % Potential Savings | 10.7% |
| Harmonic Filter Rating | 100A |
| Active Filter type | 4wire |

| kVA | kW | kvar | PF |
|---|---|---|---|
| 850.5 | 680.5 | 424.9 | 0.78 |

| Target Power Factor | 0.98 |
|---|---|
| Required PFC | 300 kvar |

**Potential Estimated Savings T4:**
72KW X 5500Hrs= 396,000 KWh *$.07/KWh= $27,720.00
Power Factor Correction Installation recommended on T4

**Total Annual Estimated KW Savings:**               **$27,720.00**
**ROI:**

**$86,789.20 Project Cost / $27,720.00 Savings X 12 months =     Less than 38 months**
**Supplier Number 1443998**



PRI

January 31, 2011

**Cost Break Out for Power Factor Installation if performed separately from full proposal**

**T2**

| Target Power Factor | 0.98 |
|---|---|
| Required PFC | 300 kvar |
| 1 PFC - 400 Volt | $13,572.00 |
| Installation of PFC | $12,428.00 |
| Total | $26,000.00 |

**T4**

| Target Power Factor | 0.98 |
|---|---|
| Required PFC | 260 kvar |
| 1 PFC - 600 Volt | $15,572.00 |
| Installation of PFC | $12,428.00 |
| Total | $28,000.00 |

**Supplier Number 1443998**



**PRI**

Ian Chown
Engineering Manager - Canada
Pepsi Beverages Company
5900 Falbourne Street
Mississauga, ON L5R 3M2, Canada

January 31, 2011

**Performance:**
These figures are based upon initial audit results and savings percentage and figures are solely due to utility rates and load conditions. This is a quotation on the goods named, subject to the conditions noted below: Pricing is subject to change based on availability of material or increase in cost by supplier. Any changes in design or layout of proposed work may impact the cost as well. This estimate is a valid offer for 30 days from the date of accompanying letter of proposal.

**Payment terms:**
Net (5) days from receipt of invoice: Progress Payments - 30% with order, 50% with design, and 20% with successful equipment installation and startup. The order for equipment and designs will be initiated upon receipt of payment.
In the event that payment is not received within the 5 day terms per percentage due, any discounts that were applied will be deducted from remaining payment installment based upon remaining percentages.

Robert Fabrizio
Vice President- Business Operations
Power Restoration International

**Supplier Number 1443998**



**PRI**

**Proposal # PBG- CANMis03**

# System Details



Mississauga System Diagram

T4

**De-Tuned Power Factor Correction on T-2 and T-4**

**Supplier Number 1443998**



**PRI**

January 31, 2011

Ian Chown
Engineering Manager - Canada
Pepsi Beverages Company
5900 Falbourne Street
Mississauga, ON L5R 3M2, Canada

## Post Installation Maintenance Proposal
### Proposal # PBG-CanMis03

| **Yearly Maintenance**<br>Quarterly Inspections of installed systems<br>Payment due at time of system installation and dedication | **Included** |
|---|---:|
| **Service Contract Total** | **$8,124** |

Robert Fabrizio
Vice President- Business Operations
Power Restoration International

**Supplier Number 1443998**

-----Original Message-----
From: More, Greg {PBC} [mailto:Greg.More@pepsico.com]
Sent: Monday, March 28, 2011 9:11 AM
To: Robert Fabrizio
Subject: Capex PO # 796859701

We will be proceeding with the attached proposal under the above PO#.

Please call to discuss installation schedules.


Greg More P. Eng.
Maintenance Manager
Pepsi Beverages Company, Mississauga
(Office) 905 568-7903
(Cell) 416 678-3608



# Invoice
Pepsi WO. 11-006

## Power Restoration International
*"Restoring Quality Back Into Power"*

NOV. 1, 2011

104 N. Malin Road
Broomall, PA 19008
Phone 610-353-2018 Fax 610-353-0518
www.global-pri.com

TO    Pepsi Bottling Group LLC
One Pepsi Way
Sommers, NY. 10589

JOB:    PO Summary amounts due

| QUANITY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| | PO # 764206701  remaining balance      Issuance date 11/16/10 | 210,090.00 | 31,513.50 |
| | PO # 627210801  balance in full due    Issuance date  4/1/11 | 15,105.75 | 15,105.75 |
| | PO# 580419701   remaining balance due for work performed | 261,639.00 | 13,286 |
| | Issuance date  3/2/11 | | |
| | **Sub Total** | | 59,905.25 |
| | **Terms: Upon Receipt** | | |

THANK YOU FOR YOUR BUSINESS!

| | |
|---|---|
| SUBTOTAL | 59,905.25 |
| SALES TAX | |
| TOTAL | *59,905.25* |

Make all checks payable to Power Restoration International
**THANK YOU FOR YOUR BUSINESS!**

