## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **POWER RESTORATION INTERNATIONAL, INC.,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **PEPSICO, INC. et al.,** | : | |
| *Defendants/Third Party Plaintiffs,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GREGORY JENNINGS et al.,** | : | **No. 12-1922** |
| *Third Party Defendants.* | : | |

PRATTER, J.                                                                 MARCH 16, 2015

### MEMORANDUM

Two motions for summary judgment are pending in this breach-of-contract dispute. First, Defendants PepsiCo, Inc., Bottling Group LLC, and Frito-Lay Trading Company (Europe), Gmbh (collectively "PepsiCo") move for summary judgment against Plaintiff Power Restoration International, Inc. ("Power Restoration"), contending that undisputed material facts establish that Power Restoration cannot succeed on its claim that PepsiCo breached an alleged oral contract for the installation of energy efficiency equipment at approximately 100 PepsiCo facilities worldwide. Second, Third Party Defendant Gregory Jennings (who is Power Restoration's President and CEO) moves for summary judgment against PepsiCo as a Third Party Plaintiff, arguing that PepsiCo has presented insufficient evidence to support its various claims against him. Having reviewed the record thoroughly and considered the arguments from all parties, the Court will grant PepsiCo's Motion for Summary Judgment and deny Mr. Jennings' Motion for Summary Judgment.

1

## I.     FACTUAL BACKGROUND[1]

Power Restoration was engaged in the business of designing and installing industrial and commercial electrical systems known as OptiSine Electrical Power Quality Systems ("EPQS"). According to Power Restoration, EPQS allow customers to reduce electrical consumption and thereby realize cost savings and increase the longevity of electrically powered equipment. The installation of harmonic abatement filters in industrial applications—a key component of EPQS—was "brand new" at the time Power Restoration was formed.[2] (Power Restoration's ("PRI") Response to Statement of Facts ("RSF") ¶ 6). At the time of the alleged oral contract, Power Restoration had no contracts with any customers for any work. Gregory Jennings was Power Restoration's President and CEO and Robert Fabrizio was Power Restoration's Vice President of Business Operations.

PepsiCo is a publicly traded, multinational corporation that engages in the manufacture, sale, and distribution of beverages and food products. Steven Bertz was a PepsiCo employee in Strategic Supply Management – Capital/MRO/ME/IPO. The parties dispute the nature of Mr. Bertz's roles in PepsiCo and Power Restoration. PepsiCo claims that Mr. Bertz was a Band 1 employee at PepsiCo (the lowest-level executive that exists in PepsiCo's corporate structure) and that Mr. Bertz had a financial interest in Power Restoration beginning in mid-2010. Power Restoration asserts that Mr. Bertz represented himself as the head of global procurement for PepsiCo, having the title "SSM Director" or "Global Procurement – Group Manager," and that Mr. Bertz never had a financial interest in Power Restoration. According to Power Restoration, any documents discussing Mr.

---

[1] The facts are undisputed unless expressly noted. Where there is a factual dispute, as long as there is record support for their position, the facts are viewed in the light most favorable to the non-movants.

[2] Although Power Restoration's partnership agreement was executed in September 2010—after the alleged oral contract had been reached in August 2010—Gregory Jennings and Robert Fabrizio testified that they were working on the business that would become Power Restoration as early as December 2009.

Bertz's interest in Power Restoration were created in contemplation of Mr. Bertz taking an interest in Power Restoration *after* he left PepsiCo.

In August 2010, at a meeting arranged by Third Party Defendant George Mazzoli,[3] Mr. Jennings met Mr. Bertz for the first time. Power Restoration alleges that Mr. Bertz and Mr. Jennings entered into an oral agreement obligating PepsiCo to procure energy services and EPQS from Power Restoration. According to Power Restoration, Mr. Bertz agreed that PepsiCo would (1) hire Power Restoration to perform audits at 150 PepsiCo facilities, (2) hire Power Restoration to design and install EPQS at approximately 100[4] PepsiCo facilities, and (3) pay an average cost of $300,000 per facility. The parties dispute whether the alleged oral contract ever existed, whether it was primarily for goods or services, and whether it was the product of collusion between Mr. Bertz (who, as stated above, allegedly had a financial interest in Power Restoration at the time) and Mr. Jennings. Mr. Jennings testified that he believed the alleged oral agreement would not be memorialized in an overarching written agreement governing upgrades at all of PepsiCo's facilities, but rather would be formalized in writing through the issuance of purchase orders on a project-by-project basis.[5]

---

[3] Mr. Mazzoli is Mr. Fabrizio's brother-in-law and was involved in Power Restoration's business.

[4] At various points in its briefing, Power Restoration assumes that EPQS would be installed at 110 facilities rather than 100 facilities. The source of that number is unclear, but whether Power Restoration contemplated performing 100 or 110 installations is immaterial to the Court's decision. For ease of analysis, the Court will assume the alleged oral contract was for 100 installations.

[5] Subsequent communications and testimony suggest that Power Restoration may not have believed that the alleged oral contract existed. *See, e.g.*, PepsiCo's Mot. Ex. 11 ("We are trusting him [Mr. Bertz] to bring in the money, which he hasn't done so far."); PepsiCo's Mot. Ex. 12 ("He [Mr. Bertz] needs to support [Power Restoration] with a contract as a member of [Power Restoration] . . . . We all think it is time to call his bluff."); Jennings Dep. 145:16-20 ("[I]t would be difficult for us to keep on going forward without written commitments from Pepsi."). Power Restoration argues that these statements reflect a need for written materials in order to market the company's services and obtain financing to support the company, not that the alleged oral contract does not exist. Also, Power Restoration claims that some of the need for a written commitment related to Mr. Mazzoli and Mr. Bertz allegedly conspiring to steal business from Power Restoration.

PepsiCo claims that Mr. Bertz continued to conspire with Power Restoration after the alleged oral agreement was reached. For example, an internal Power Restoration communication from September 7, 2010 contemplated giving Mr. Bertz 5% of Power Restoration's profits, and a communication from September 22, 2010 listed Mr. Bertz as "the advisory counselor" in Power Restoration's company structure and management. On September 26, 2010, Mr. Mazzoli sent an email to Mr. Jennings stating that he and Mr. Bertz could not pursue a membership or consultant relationship with Power Restoration because of potential conflicts of interest with their employment at Siemens and PepsiCo, respectively. The next day, Mr. Jennings circulated conference call notes purporting to memorialize that Mr. Mazzoli and Mr. Bertz "are not investing in [Power Restoration] as an outside entity or partner in any way. They feel it is incorrect to do so based upon their personal employment positions." (PepsiCo's Mot. Ex. 8 at PRI 00840). Power Restoration maintains that Mr. Jennings did not question the veracity of Mr. Mazzoli's email or the conference call notes until long after he received them, but Mr. Jennings testified that he understood at the time he received the email that it was a "false statement," at least with respect to Mr. Mazzoli. (*See* Jennings Dep. 85-86). Moreover, in October 2010, Power Restoration and Mr. Bertz were in talks to give Mr. Bertz a 19% ownership interest in Power Restoration, and in November 2010, Mr. Jennings learned that Mr. Bertz planned to incorporate a separate legal entity (Dark Wing, LLC) to be a partner in Power Restoration on his behalf.

In late 2010 and early 2011, PepsiCo hired Power Restoration to install EPQS at three PepsiCo facilities in Hayward, California, Stone Mountain, Georgia, and Mississauga, Ontario. PepsiCo claims that it engaged Power Restoration to perform energy audits and prepare specific written proposals for the installation of EPQS at those three facilities, and that PepsiCo would decide whether or not to purchase goods or additional services from Power Restoration based on the results of the audits and the written proposals. PepsiCo issued purchase orders to document the

Hayward, Stone Mountain, and Mississaugua transactions. Power Restoration argues that the use of purchase orders for these facilities is evidence of the alleged oral contract, which was to be implemented through the issuance of written purchase orders on a project-by-project basis. Power Restoration also conducted audits at numerous PepsiCo locations and submitted proposals to install EPQS at three PepsiCo facilities in Europe.

On February 15, 2011, Mr. Bertz sent a "Letter of Intent" to Power Restoration purporting to confirm PepsiCo's intent "to procure over the next 12 months, Power Quality Solutions to be installed at PepsiCo facilities located in multiple countries," "to conduct at least 150 audits of these facilities," and "to issue 100 Orders to PRI Global Enterprises[6] for design and installation during this period, with an average cost of $300,000." (PepsiCo's Mot. Ex. 16). Power Restoration contends that the Letter of Intent confirms the existence of the alleged oral contract, but PepsiCo claims that the Letter of Intent was issued to a non-existent company and that Mr. Jennings (the President and CEO of Power Restoration) has admitted that the Letter of Intent is a fraud. Mr. Bertz issued a letter two days later expressly canceling and rescinding the previous Letter of Intent. PepsiCo claims that it eventually terminated Mr. Bertz after learning of and investigating his relationship with Power Restoration. On May 27, 2011, after PepsiCo concluded that Power Restoration did a poor job of installing the EPQS at the Hayward facility, PepsiCo terminated its outstanding purchase orders with Power Restoration.

On April 13, 2012, Power Restoration filed suit against PepsiCo. Power Restoration's Amended Complaint (Docket No. 38) includes: (1) a breach of contract claim for lost profits and expectation damages (Count 1), (2) an unjust enrichment claim for the value of services and goods

_____

[6] Power Restoration previously represented that the Letter of Intent was supposed to refer to Power Restoration, but that it referred to "PRI Global Enterprises" due to a typographical error. (*See* Oct. 11, 2013 Mem. (Docket No. 34) at 7 n.10). However, Mr. Jennings later described PRI Global Enterprises as a "fictitious company" used by Mr. Bertz and Mr. Mazzoli in an effort to "steal" PepsiCo business opportunities from Power Restoration. (*See* PepsiCo's Mot. Ex. 18; Jennings Dep. 220-21).

already provided to PepsiCo (Count 2), (3) a conversion claim (Count 3), and (4) a claim for misappropriation of trade secrets (Count 4). As part of Count 1, Power Restoration seeks over $9 million in profits that it claims were lost as a result of PepsiCo's breach of the alleged oral contract. To calculate the amount of lost profits, Power Restoration begins with the terms of the alleged oral agreement as described in the Letter of Intent, and then interprets those terms in light of the testimony from Mr. Fabrizio and Mr. Jennings that they expected to earn a 30% profit on the contract. The only evidence of Power Restoration's costs are Power Restoration's 2010 tax return, a budget prepared in December 2010, and projections prepared by Mr. Fabrizio for the years 2011 and 2012. The evidence in the record explains neither how Mr. Fabrizio arrived at his projections, nor why Mr. Fabrizio and Mr. Jennings believed that Power Restoration would earn a 30% profit on the contract with PepsiCo.

## II. LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented by the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.   DISCUSSION

### A.   PEPSICO'S MOTION FOR SUMMARY JUDGMENT

PepsiCo's Motion for Summary Judgment on Power Restoration's claim for breach of the alleged oral contract[7] advances three arguments: (1) there is no genuine evidence to support the claim for lost profits damages under the alleged oral contract; (2) the alleged oral contract is barred by the Statute of Frauds; and (3) the alleged oral contract was never formed. For the reasons that follow, the Court will grant summary judgment on the oral-agreement claim in favor of PepsiCo.

---

[7] PepsiCo is not entitled to summary judgment on Count 1 *in its entirety* because PepsiCo has only moved for summary judgment on claims related to the alleged oral contract. (*See* PepsiCo's Mot. Br. 1 n.1). Although Power Restoration resists labeling the purchase orders as separate contracts, (*see* Oral Arg. Tr. (Docket No. 100) at 51:4-52:6), PepsiCo's Motion does not relate to any claims for breach of the purchase orders that were actually issued, so granting the Motion would not dispose of Count 1, but rather limit the issues raised in that Count.

1.    Lost Profits Damages

To succeed on a claim for breach of contract under Pennsylvania law, Power Restoration must prove (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

Case law is replete with straightforward rulings that dictate the demands placed upon a plaintiff making claims such as Power Restoration makes here: "It is well settled law in Pennsylvania that loss of profits are recoverable upon proper proof . . . in contract . . . ." *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983). Pennsylvania courts permit plaintiffs to recover lost profits in the amount of "net profits," defined as "gross revenue less fixed costs, and less variable costs pegged to the number of units sold." *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 735-36 (3d Cir. 1991) (quoting *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir. 1975)); *see also* Howard O. Hunter, Modern Law of Contracts § 14:17 (2014) ("It is impossible to prove profits without first proving costs."). "The determination of damages is a factual question to be decided by the fact-finder," and the plaintiff bears the burden of proving damages by a preponderance of the evidence. *Delahanty*, 464 A.2d at 1257.

Furthermore, the recovery of lost profits "pits the plaintiff's right to the bargain of his contract against the need to prevent jury verdicts based on speculation rather than proper proof." *Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 495 (3d Cir. 1987). As a result, "[t]he general rule of law applicable for loss of profits . . . allows such damages where (1) there is evidence to establish them with reasonable certainty, [and] (2) there is evidence to show that they were the proximate consequence of the wrong; and, in contract actions, that they were reasonably foreseeable." *Delahanty*, 464 A.2d at 1258; *see Exton Drive-In, Inc. v. Home Indem. Co.*, 261 A.2d

8

319 (Pa. 1969) (citing Restatement (First) Contracts § 331); *General Dynafab, Inc. v. Chelsea Industries, Inc.*, 447 A.2d 958, 960 (Pa. Super. Ct. 1982) ("[D]amages may be assessed for loss of profit where . . . damages are capable of proof of reasonable certainty." ); *Ware*, 322 F.3d at 226 (noting that "a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty'").[8] "At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague, or contingent' upon some unknown factor." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 668 (3d Cir. 1998) (quoting *Spang & Co. v. United States Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988)); *see Delahanty*, 464 A.2d at 1258 ("[T]he law does not demand that the estimation of damages be completely free of all elements of speculation . . . and evidence of damages may consist of probabilities and inferences."). "Although lost profits need not be established with mathematical certainty, they must be established with 'a fair degree of probability.'" *In re Joseph B. Dahlkemper Co., Inc.*, 165 B.R. 149, 156 (W.D. Pa. 1994). To recover lost profits, a plaintiff "is required only to provide the jury with a reasonable amount of information so as to enable the jury fairly to estimate damages without engaging in speculation." *Bolus v. United Penn Bank*, 525 A.2d 1215, 1226 (Pa. Super. Ct. 1987); *see Delahanty*, 464 A.2d at 1257-58. "[F]ailure to produce evidence concerning the factors essential to establish net profit [would mean] that the jury would have . . . to speculate as to the amount of damages." *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112, 1116 (3d Cir. 1973).

And case law also provides: "Though damages for alleged lost profits can be given, they cannot be recovered where they are merely speculative." *Delahanty*, 464 A.2d at 1258. "Speculative

---

[8] Power Restoration urges the Court to distinguish between "breach of contract damages" and "lost profit damages." (*See* Pl.'s Supp. Br. 1-3). But such a distinction in verbiage is immaterial and meaningless in the present context because Pennsylvania law requires plaintiffs to prove all contract damages to a "reasonable certainty," whether they are characterized as "breach of contract damages," "lost profit damages," "potential lost profits," or "actual lost profit damages." *See id.* at 4-5; *ATACS Corp.*, 155 F.3d at 669-70; *see also* Restatement (Second) Contracts §§ 346, 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

profits are those the evidence of which is so meager or uncertain as to afford no reasonable basis for inference." *Birth Center v. St. Paul Cos., Inc.*, 727 A.2d 1144, 1162 (Pa. Super. Ct. 1999) (quoting Restatement (Second) of Contracts § 331(1) cmt. c); *see Merion Spring Co. v. Muelles Hnos. Garcia Torres, S.A.*, 462 A.2d 686, 695 (Pa. Super. Ct. 1983) ("Damages for lost profits, like other contract damages, may not be awarded when the evidence leaves the trier of fact without any guideposts except his or her own speculation."); *Jahanshahi v. Centura Dev. Co.*, 816 A.2d 1179, 1184 (Pa. Super. Ct. 2003). "Though justice and public policy require that the wrongdoer bear the risk of uncertainty which his own wrong has created and which prevents the precise computation of damages, the fact-finder still may not render a verdict based on speculation or guesswork." *Lynch v. Bridges & Co. Inc.*, 578 A.2d 414, 416 (Pa. Super. Ct. 1996) (quoting *Delahanty*, 464 A.2d at 1258).

Moreover, "[a] review of the cases in Pennsylvania involving lost profits shows that the courts are reluctant to award them, except when the business concerned is established and not new and untried." *Delahanty*, 464 A.2d at 1258 (internal quotation marks omitted); *see Exton*, 261 A.2d at 324 ("Under the circumstances of this case, we hold that the anticipated profits of a new and untried business . . . were too speculative to provide a basis for an award of damages."); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 680 (3d Cir. 1991) ("The Pennsylvania Supreme Court has been skeptical of claims for loss of profits by a 'new and untried business.'"); *Nat'l Controls Corp.*, 833 F.2d at 495-96 (noting that claims for lost profits "may be rejected as speculative and unrecoverable," particularly "where the claim of lost profits is made in the context of a new and untried business venture"). "Whereas recovery for the lost profits of an established business are considered ascertainable to a reasonable degree of certainty, when a business is new and untried, courts have declared the measure of anticipated profits too speculative to provide a basis for an award of damages." *Delahanty*, 464 A.2d at 1260 (internal citation omitted)).

While it is true that Pennsylvania courts have rejected the traditional rule that the lost profits of a new business are inherently too speculative to be recovered as damages, *see Jahanshahi*, 816 A.2d at 1184 (explaining that new businesses "may be able to adduce sufficient evidence to obtain an award for lost profits while recognizing that such proof is often more difficult to present"), case law also states clearly that "a new business still has a heavier burden in proving that lost profits are sufficiently certain to be recovered." *Delahanty*, 464 A.2d at 1260; *In re Sulakshna, Inc.*, 207 B.R. 422, 432 (E.D. Pa. Bankr. 1997) (noting that a new business's claim for lost profits requires "more persuasive evidence than is required in the case of an ongoing business"). In the absence of business history, evidence of lost profits "must be substantial and it must be shown to have a close relationship to the individual firm in question as well as the relevant economic and financial conditions prevailing at the time the losses occurred." *Merion Spring*, 462 A.2d at 488; *Nat'l Controls Corp.*, 833 F.2d at 495-96 (observing that the "burden of proof is high with respect to new business profits").

Two important Pennsylvania cases illustrate the circumstances in which lost profits may be awarded and, in the process, underscore the problem for plaintiff here. In *Delahanty v. First Pennsylvania Bank, N.A.*, the owners of Delahanty Auto Sales (a 5-year old used car business) and Cascade Car Corporation (a newly created car leasing business), alleged that First Pennsylvania Bank had fraudulently and maliciously destroyed both businesses. 464 A.2d at 1248. After finding for the plaintiffs and concluding that Cascade "would have been a profitable business had it not been for the fraudulent and malicious acts of the Bank," the trial court awarded Cascade's lost profits as part of the damages. *Id.* at 1261-62. On appeal, the Bank argued that Cascade's lost profits were too speculative to be awarded as damages because Cascade was a new business. The Superior Court of Pennsylvania agreed, noting that "Cascade was only in operation for seven months" before its destruction. *Id.* at 1260. Although plaintiffs had produced "handwritten calculations, projecting

11

Cascade's operation for six full years," the Superior Court found that there was insufficient evidence to calculate damages to a reasonable certainty because "the basis for [plaintiffs'] estimations and projections was not . . . established in the record. No evidence was presented that supported the assumption that the business would have a profit the first year of operation and that this profit would increase annually . . . ." *Id.* at 1260-61. In contrast, the Superior Court found that Delahanty Auto Sales was "an established business and had been in operation for about five years," so its lost profits were not too speculative to be awarded as damages. *Id.* at 1261-62.

In *Merion Spring Co. v. Muelles Hnos. Garcia Torres, S.A.*, Muelles (a new Mexican corporation) alleged that Merion Spring breached a contract for the sale of 25 automobile spring manufacturing machines. *See* 462 A.2d at 689-90. After the trial judge returned a general decision in favor of Muelles, the Court of Common Pleas *en banc* concluded that Muelles had failed to produce sufficient evidence of lost profits and entered judgment notwithstanding the verdict in favor of Merion Spring. *Id.* at 691. On appeal, the Superior Court of Pennsylvania reversed and held that Muelles had presented sufficient evidence of lost profits. The Court explained that "[b]ecause there is no business history from which to reasonably predict subsequent events, the evidence must be *substantial* and it must be shown to have a close relationship to the individual firm in question as well as the relevant economic and financial conditions prevailing at the time the losses occurred." *Id.* at 696 (emphasis added). Although the only witness to testify on the issue of lost profits was the corporation's general manager, the Superior Court concluded that his testimony was sufficient because he "provided a *wealth of details* concerning economic and financial conditions prevailing in Mexico [and] *specific data* concerning the Mexican government's protection of domestic manufacturing, estimated plant production, prices, direct and indirect labor cost, the cost of skilled and supervisory labor, administrative and sales staff and operations expense and the broad outlines of the applicable tax structure." *Id.* at 697 (emphases added).

Here, the undisputed facts demonstrate that Power Restoration was a new and untried business. (*See* PepsiCo's Mot. Statement of Facts ¶ 6; PRI RSF ¶ 6). At most, Power Restoration calculates its lost profits based on three assumptions: (1) Power Restoration would have completed 150 audits and installed 100 EPQS in the 2011 calendar year, per the terms of the alleged oral contract; (2) Power Restoration would have received an average of $300,000 per EPQS, per the terms of the alleged oral contract; and (3) Power Restoration would have made a 30% net profit on the alleged oral contract. In support of the 30% profit margin, Power Restoration relies on a self-serving spreadsheet from December 2010 listing revenues and expenses (*see* PRI Ex. 50), an equally self-serving projected budget for the years 2011 and 2012 that Mr. Fabrizio prepared, (*see* PRI Ex. 49), Power Restoration's 2010 tax return (PepsiCo's Mot. Ex. 23), and the testimony of Mr. Jennings and Mr. Fabrizio in which Mr. Jennings predicted in conclusory fashion that Power Restoration would earn a "30 to 40" percent profit on each facility, (Jennings Dep. 345:3-8), and Mr. Fabrizio testified, "[I]f we plug in true values where we thought we were going to be," the profit margin "would have been 30 to 35%," (Fabrizio Dep. 207:10-21).[9]

Assuming for now the alleged oral contract were enforceable, Power Restoration has produced insufficient evidence to support its claim for lost profits. The testimony from Mr. Jennings and Mr. Fabrizio is entirely inadequate because neither witness explains the bases for the projected profit margin. It is as easy to conclude the estimates were "pie in the sky" as to conclude that they bore any relation to reality. Mr. Fabrizio's testimony is also inadequate because he does not explain

---

[9] It is unclear what information is contained on pages PRI 18004-05 of Power Restoration's Exhibit 49. Page PRI 18004 is entitled "Working Capital Estimates as of 11/24/2010" and contains a variety of costs that appear to be estimated. Page PRI 18005 is an untitled financial sheet purporting to list Power Restoration's "Revenue" ($250,420.00) and "Operating Expenses" ($213,273.27). There is no testimony or other evidence explaining the significance of these documents with respect to the cost of performing the alleged oral contract, and there is no evidence in the record to explain how these apparent estimates would help a jury determine lost profits with reasonable certainty. Nor is there any explanation in the record about the origin of the estimates or numbers or their authenticity.

what he meant by Power Restoration being "where we thought we were going to be" in terms of costs and revenues—a phrase at the heart of Mr. Fabrizio's testimony regarding the projected profit margin. Although a corporate officer may offer lay opinion testimony on the issue of lost profits, based on facts within his or her personal knowledge or that are independently admissible, *see Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1175-76 (3d Cir. 1993), conclusory assertions simply do not constitute the "substantial evidence" required to prove lost profit damages for a new business, *see Delahanty*, 464 A.2d at 1260-61. The record here has no explanation of the bases for the projections offered by either Mr. Jennings or Mr. Fabrizio on the issue of lost profits, so their testimony cannot help Power Restoration survive summary judgment.

Furthermore, the projected budget for 2011-2012 is not sufficient evidence of lost profits because it provides an insufficient basis for determining Power Restoration's costs of performing the alleged oral contract. "Failure to produce satisfactory cost evidence dooms a lost profits claim to failure, because the trier of fact has no basis on which to compute profits." Howard O. Hunter, Modern Law of Contracts § 14:17. The fact that Mr. Fabrizio reduced his speculative projections to a spreadsheet does not change the fact that they are speculative. Making unsupported numbers look efficacious does not make them so. A factfinder could not determine the amount of lost profits to a reasonable certainty given this dearth of evidence.

Similarly, the December 2010 spreadsheet and the 2010 tax return provide a snapshot of Power Restoration's profits and revenues after nothing more than a single installation of EPQS in the United States. A jury would still lack sufficient information from which to determine damages to a non-speculative degree because there is no testimony or evidence explaining how the cost of performing a single installation is representative of future costs. In light of the evidence in the

14

record, a single data point, without more, is not enough for a reasonable jury to determine lost profits to a reasonable degree of certainty.[10]

In an attempt to avoid summary judgment, Power Restoration argues that "[i]f a business is able to show that they had a significant interest in their product before the contract was breached, there is sufficient evidence for the jury to find loss profits." (PRI Br. 37). This is a misstatement of the law and, in any event, the "significant interest" test on which Power Restoration relies is inapposite. In *General Dynafab, Inc. v. Chelsea Industries, Inc.*, the Superior Court of Pennsylvania held that a business could be taken out of the "new and untried" category if it could show a "significant interest" in their product or service before the contract was breached. *See* 447 A.2d at 960. But "*Dynafab*'s adoption of this 'significant interest' language . . . does not, however, change the law in Pennsylvania that a new business still has a heavier burden in proving that lost profits are sufficiently certain to be recovered." *Delahanty*, 464 A.2d at 1260. Evidence of "significant interest" is just "one of many factors which are important in determining if the evidence of lost profits is sufficient to allow it to be submitted to the jury for consideration." *Id.* Notwithstanding evidence of PepsiCo's alleged "significant interest" in EPQS, Power Restoration's reliance solely on speculation regarding the anticipated profit margin means that it has failed to meet its "heav[y] burden" of proving lost profits to a reasonable certainty. Power Restoration has failed to provide "substantial" evidence of lost profits, and the necessary "wealth of details" is absent.

Moreover, the "significant interest" language from *Dynafab* is inapposite because this case presents the inverse of the problem that exists in most Pennsylvania cases involving "new and untried" businesses (including *Dynafab*). Plaintiffs must introduce evidence from which a factfinder could determine both *revenues* and *costs* to a reasonable certainty. *See Deaktor*, 475 F.2d at 1116.

---

[10] Moreover, the December 2010 spreadsheet provides no apparent support for Power Restoration's claim of 30% profits, as the actual expenses *exceeded* actual revenues and even the projected revenues did not exceed projected expenses by 30%.

Ordinarily, claims for lost profits involving "new and untried" businesses fail for lack of reasonably certain *revenues*. *See, e.g.*, *Dynafab*, 447 A.2d at 960. As a result, evidence of "significant interest" in a product or service can help some "new and untried" businesses survive summary judgment by liberally permitting evidence *of expected revenues* to go to the jury.[11] Here, however, the alleged oral contract already provides evidence of expected gross revenues because it obligates Power Restoration to install 100 EPQS for PepsiCo at an average cost of $300,000 per installation. Nevertheless, the case cannot go to a jury because there is absolutely no evidence explaining the basis for Power Restoration's estimated *costs*. Under Pennsylvania law, a jury is not entitled to award lost profits based on speculation regarding either element of the net-profit equation (i.e., *revenues* minus *costs*). *See Deaktor*, 475 F.2d at 1116 ("Plaintiffs' failure to produce evidence concerning the factors essential to establish net profit . . . meant that the jury would have had to speculate as to the amount of damages."). Although Power Restoration can point to the alleged oral contract as evidence of PepsiCo's alleged "significant interest" in EPQS, there is no evidence from which a factfinder could determine Power Restoration's *costs* with reasonable certainty.[12]

---

[11] According to the *Delahanty* court, *Dynafab* stands for the proposition that "lower courts should liberally allow evidence of alleged lost profits to be submitted to the jury and let them decide if in light of the history of the business whether the amount of such profits could be estimated with reasonable certainty so as to allow recovery." *Delahanty*, 464 A.2d at 1260. However, as was the case in *Delahanty* itself, a claim for lost profits should not go to the jury when (a) there is too little "evidence of alleged lost profits" for a court to submit to the jury, *and* (b) there is too little "history of the business" to estimate lost profits with reasonable certainty.

[12] PepsiCo's expert report would not enable a jury to determine lost profits to a reasonable degree of certainty. (*See* PepsiCo's Mot. Ex. 22). The report concludes that Power Restoration's estimate of lost profits is unsupported by the evidence in the record. But the report neither states that lost profits could be predicted to a reasonable degree of certainty, nor contains any analysis that predicted lost profits in such a manner. Indeed, Power Restoration concedes as much in its Motion *In Limine* to exclude the expert report. (*See* PRI's Mot. *In Limine* (Docket No. 84) at 5 ("PRI was a business formed to install new technology that has never been used before in the field. As such, any comparison to 'similar' companies is misplaced."); *id.* at 8 ("Ms. Allen does not have the knowledge or expertise to opine upon this highly distinctive industry and the lost profits suffered as a result of Defendant PepsiCo's breach of its Contract with PRI.").

Power Restoration explains in its brief that it "has produced *and will introduce* substantial and compelling evidence supporting its lost profit claim including the testimony of Messrs. Jennings and Fabrizio as to the calculation of lost profit and the actual purchase orders and proposals setting forth the cost of labor and materials for each installation." (PRI Br. 38 (emphasis added)). But "summary judgment is essentially 'put up or shut up' time for the non-moving party." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). Power Restoration cannot survive summary judgment based on its assurance that it has more evidence to introduce. Had Power Restoration presented testimony regarding the basis for its projected costs or how the cost of a single installation was representative of the cost of performing the entire alleged oral contract, there may have been sufficient evidence to survive summary judgment. However, on the record before the Court, there is not enough evidence from which a jury could determine the amount of lost profits to a reasonable certainty.

Power Restoration correctly points out that it may recover nominal damages under Pennsylvania law even if it cannot prove lost profits. *See Fishkin v. Susquehanna Partners, G.P.*, 563 F. Supp. 2d 547, 591 (E.D. Pa. 2008) ("Pennsylvania law allows nominal damages for a breach of contract claim."); *Scobell, Inc. v. Schade*, 688 A.2d 715, 719 (Pa. Super. Ct. 1997) ("[A]ny breach of contract entitles the injured party to at least nominal damages."); *Aiken Indus., Inc. v. Estate of Wilson*, 383 A.2d 808, 811-12 (Pa. 1978) ("Though any breach of contract entitles the injured party at least to nominal damages, he cannot recover more without establishing a basis for an inference of fact that he has been actually damaged."). Although the Amended Complaint seeks only expectation damages expressly, the Court will consider the issue of nominal damages because Power Restoration raised it in its supplemental brief. (*See* PRI Supp. Br. 2).[13] Nominal damages are

---

[13] Neither the Amended Complaint nor Power Restoration's summary judgment briefing claims expressly that Power Restoration is entitled to reliance damages. *But see ATACS Corp.*, 155 F.3d at 669 (citing *Trosky v. Civil Service Comm'n, City of Pittsburgh*, 652 A.2d 813, 817 (Pa.

limited to $1.00. *See Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 728 (Pa. 1964)

("[W]hen nominal damages are awarded in our courts, one dollar shall be the measure thereof."). As

a result, the Court will next consider whether PepsiCo is entitled to summary judgment on Power

Restoration's claim for nominal damages on one of the other grounds advanced in its brief.[14]

2.       Statute of Frauds

Under Article 2 of the Uniform Commercial Code ("UCC"), as adopted in Pennsylvania, "a

contract for the sale of goods for the price of $500 or more is not enforceable by way of action or

defense unless there is some writing sufficient to indicate that a contract for sale has been made

between the parties and signed by the party against whom enforcement is sought . . . ." 13 Pa. Cons.

Stat. Ann. § 2201(a).

The possible application of § 2201(a), commonly known as the "Statute of Frauds," requires

analysis of whether the contract is one for "goods" or "services." "Goods" are defined as "all things

(including specially manufactured goods) which are movable." *Id.* § 2102. Pennsylvania law

recognizes several limited exceptions to the Statute of Frauds, so the writing requirement is relaxed

if (1) the parties to the contract are merchants and one merchant sends a writing in confirmation of

the contract to the other, (2) the goods are specially manufactured, or (3) the parties have partially

performed the contract. *See id.* at § 2201(b)-(c). Many jurisdictions treat the question of whether

goods or services predominate in a mixed goods and services contract as a question of fact, *see, e.g.*,

*Conopco, Inc. v. McCreadie*, 826 F. Supp. 855, 868 (D.N.J. 1993), but Pennsylvania courts can—

_____

1995)). However, because the Court's analysis in Part III.A.2 would bar Power Restoration from
recovering any form of contract damages in connection with the alleged oral contract, whether or
not plaintiff seeks reliance damages, nominal damages, or both is immaterial to the outcome of this
case.

[14] Although $1 is certainly much less than $9 million, the Court assumes (for purposes of the
Motion) that Power Restoration could pursue its claim for nominal damages. Indeed, it is entirely
possible that nominal amounts will suffice for Power Restoration to prove some important point.
High stakes can be wagered (albeit sometimes only cinematically) for just $1. *See, e.g.*, "Trading
Places" (Paramount Pictures 1983) (Louis Winthorpe III: "The Dukes . . . ruined my life . . . over a
bet? For how much?" Billy Ray Valentine: "A dollar.").

and almost always do—decide the issue as a matter of law, *see, e.g.*, *Cober v. Corle*, 610 A.2d 1036

(Pa. Super. Ct. 1992).

The parties here agree that the value of the alleged oral contract exceeds $500 and that no

writing satisfies the requirements of § 2201(a). Accordingly, Power Restoration's claim for breach

of the alleged oral contract is barred by the Statute of Frauds unless the contract is somehow outside

the scope of the Statute. Power Restoration seeks to escape the Statute of Frauds with four

arguments: (1) the contract was predominantly for services rather than goods, (2) the goods were

specially manufactured, (3) the contract was confirmed in writing, and (4) Power Restoration

partially performed the contract. The Court will address these arguments in turn.

a.      Contract for Goods or Services

By its terms, Article 2 of the UCC only applies to contracts for the sale of goods. Whether or

not the alleged oral contract is "a contract for the sale of goods" (and therefore subject to the UCC's

Statute of Frauds) is determined according to a two-step analysis. The first step is to determine

whether there is a "significant service component" to the alleged oral agreement. *See* Williston on

Contracts § 26:20 (4th ed.). If there is no significant service component, then the contract is for the

sale of goods and the Statute applies; if there is a significant service component, then the second

step of the analysis is to conduct the predominant factor test. *Id.* In the Third Circuit, courts

determine the applicability of the UCC to a mixed contract for goods and service "by examining the

predominance of goods or services . . . ." *Advent*, 925 F.2d at 676 (applying Pennsylvania law). The

ultimate goal of the "predominant factor" test is to "consider the purpose or essence of the

contract." *Id.* Courts consider the totality of the circumstances, and their analyses have generally

focused on (1) the relative costs of the materials supplied with the costs of the labor; (2) the

compensation structure of the agreement; (3) the language and circumstances surrounding the

contract; and (4) the interrelationship of the goods and services to be provided (i.e., whether one is

incidental to the other. *See id.*; *KSM Assocs., Inc. v. ACS State Healthcare, LLC*, No. 05-4118, 2006 WL 847786 (E.D. Pa. Mar. 30, 2006).

The alleged oral contract in this case undeniably included a significant service component. Pursuant to the alleged oral contract, Power Restoration agreed to audit 150 PepsiCo facilities worldwide to identify which ones would benefit from the installation of EPQS, and then to design and install EPQS for those facilities. (*See* PRI Ex. 16). PepsiCo would not purchase any goods unless Power Restoration first performed an energy audit and then designed and installed the EPQS. These terms demonstrate that, at the very least, the alleged oral contract was a "mixed goods and services arrangement," *Advent*, 925 F.2d at 676, so the applicability of the Statute of Frauds can only be determined in light of the predominant factor test.

In this case, the Court finds ultimately persuasive the fact that the goods component of the alleged oral contract represents a significant and material percentage of the total contract price. The five proposals that Power Restoration submitted to PepsiCo—and that Power Restoration advances as important evidence of the terms of the alleged oral contract, (*see* PRI Br. 15-16)—are formatted identically, listing the following 6 deliverables: (1) "Proprietary Software and Control Systems"; (2) "Metering enclosures, devices, and proprietary hardware"; (3) "Power Filters Hardware"; (4) "Installation of Filters, Metering, Control System, and Software"; (5) "Power Quality Audit Cost"; and (6) "Drop Material, Labor, and Installation Supervision." The prices quoted for the "Proprietary Software and Control Systems" and "Power Filters Hardware"—goods under the UCC, *see Advent*, 925 F.2d at 676—were never less than 86% of the total prices quoted to PepsiCo, with those costs exceeding 90% of the total prices for 3 of the proposals. In contrast, the only deliverable for services in each proposal—"Installation of Filters, Metering, Control System, and Software"— never exceeded 14% of the total prices quoted to PepsiCo, with the prices for the service deliverable

not exceeding 10% of the total prices for 4 of the proposals. This disparity weighs heavily in favor of concluding that the alleged oral contract was predominantly for goods.

Power Restoration focuses on specific line items in its proposals to argue that service costs make up a substantial portion of the overall prices quoted for the EPQS. For example, each of the prices quoted for "Proprietary Software and Control Systems" and "Power Filters Hardware" included a service component because under "Proprietary Software and Control Systems" is the phrase "WinPM Configuration and WinPM Commissioning," and under "Power Filters Hardware" is the phrase "Fuse Holder Enclosure Assembly." Additionally, because each of the proposals deems "Drop Material, Labor, and Installation Supervision" to be "included" in the overall prices, Power Restoration contends that the proposals obscure the fact that those costs are significant portions of the prices quoted. In the overall context of this business relationship, the Court is not persuaded that these line items are enough to overcome the weighty disparity between the apparent price of goods and the apparent price of services in the alleged oral contract. No reasonable jury could conclude that the service-like line items in the proposal can transform what appears to be a proposal for the sale of goods into a proposal for the sale of services. At most, those services are incidental to the provision of goods, as evidenced by their inclusion as subsidiary line items rather than full deliverables in the proposal. *See infra.*

Power Restoration also relies on Mr. Jennings' affidavit to argue that services make up a substantial portion of the overall prices quoted in the EPQS proposals. In his affidavit, Mr. Jennings states that "[t]he costs for the 'goods' component of the [Hayward] Proposal, i.e., the filters, metering equipment, and software totaled $54,623.00," and "[t]he remainder of the costs identified in the [Hayward] Proposal, i.e., $297,877.00, was to compensate [Power Restoration] for its proprietary technology, profit, and labor in designing, installing and managing the installation of the goods . . . ." (PRI Ex. 4). But the affidavit does not dispel the effect of apparently contradictory and,

even more apparently, candid testimony under oath and subject to cross-examination during his deposition that the cost of goods and services together represented 60-70% of the proposal price, and that he did not have "an approximate breakdown between materials and labor for that 60 to 70 percent." (Jennings Dep. at 340:18-24). "[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004); *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) ("A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."). To permit a party to do so would be to permit a party to overcome summary judgment based on any dispute of material fact, even when the dispute is not genuine. *See id.* Although Mr. Jennings "ha[d] the opportunity to offer a 'satisfactory explanation' for the conflict between the prior deposition and the affidavit," *id.* at 254 (quoting *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)), he failed to explain that conflict. Consequently, the Court will disregard his affidavit on this point and conclude from the face of Power Restoration's proposals that the value of the goods provided greatly exceeded the value of the services rendered, so that goods predominate in the alleged oral contract.[15]

---

[15] Even if the Court were to consider Mr. Jennings' affidavit, the affidavit does not demonstrate that the contract is predominantly for services rather than goods. Mr. Jennings distinguishes between the cost of the goods Power Restoration offered to provide and the cost of Power Restoration's "proprietary technology." But the proprietary aspect of the EPQS was the way in which the goods fit together in the system, not any service component associated with the EPQS. The proprietary nature of the EPQS is similar to that of a secret recipe: the seller may assemble the ingredients and prepare the food in a proprietary way, but any premium paid for the benefit of that secret recipe will not transform a contract for the sale of the finished product into a contract for the provision of proprietary services. Similarly, the premium paid for proprietary technology in this case is more properly attributed to the goods component of the contract than the service component, and goods predominate in the contract. The cost of the services as described above pales in comparison to the cost of goods when properly identified.

Having concluded that the relative costs of goods and services support the conclusion that the alleged oral contract was predominantly for goods, the Court finds unpersuasive Power Restoration's other reasons for believing that the alleged oral contract was predominantly for services. First, Power Restoration focuses on the fact that the alleged oral contract obligated it to audit PepsiCo facilities, design EPQS for particular PepsiCo facilities, install the EPQS, and manage the overall program. (*See* PRI Br. 14-15). But the language and circumstances surrounding the alleged oral contract demonstrate that the primary purpose of the contract was the acquisition of Power Restoration's proprietary EPQS technology, as modified to fit particular PepsiCo facilities. As a preliminary matter, the Court notes that "Contracts calling for the creation of a system designed to perform a particular function or task" or "to sell the necessary component parts and to install a system" have, in a number of cases, been treated as contracts for the sale of goods. 2 Anderson U.C.C. § 2-105:169 (3d ed.). Indeed, such systems are "for all practical purposes, merely specially manufactured goods specifically governed by Article 2." *Id. See* 13 Pa. Cons. Stat. Ann. § 2105 (defining "goods" to include "specially manufactured goods"). Furthermore, in the proposals, Power Restoration explained that it would "supply and install *the items described below*" to help PepsiCo reduce its energy consumption. (*See* Am. Compl. Ex. F at 1 (emphasis added)). Power Restoration's proposals describe themselves as quotations, "*on the goods named . . . .*" *Id.* (emphasis added). Consequently, Power Restoration's reliance on the existence of a significant service component to the alleged oral contract is not enough to succeed under the predominant factor test.

The language and circumstances of the alleged oral contract further suggest that the service component of the alleged oral contract was incidental to the goods component of the contract. It is undisputed that the cost of labor and installation was deemed "included" in the proposal. An element of a transaction that is so important that it rises to the level of being its "essence" would not

have been included in the price so discreetly. Indeed, "Labor" is listed alongside "Drop Material" as a single deliverable, demonstrating, by way of comparison, that services were no more valuable to the alleged oral contract than the accessories needed to complete the installation of cables. Consequently, the service component of the contract was incidental to the goods component of the contract, "[a]ny consulting services rendered by [Power Restoration] were ancillary to the contract, and [they] cannot reasonably be treated as standing separately to escape the [Statute of Frauds.]" *Conopco*, 826 F. Supp. at 867.

Additionally, the undisputed evidence demonstrates that the pricing of the installation at various locations was driven primarily by the cost of goods, not the cost of services. Mr. Jennings testified at his deposition that pricing was established primarily based on the number and type of goods provided, not based on the nature of the services provided. (*See* Jennings Dep. 336 ("Based upon the number of units in the system, computer, the number of transformers that are on site would dictate total price.")). Each of Power Restoration's proposals describe itself as "a quotation on the goods named," not a quotation on proposed services. (Am. Compl. Ex. F at 5). Moreover, the fact that the fees for the energy audits were waived if PepsiCo purchased an EPQS is strong evidence that the proposals were structured to encourage the purchase of goods rather than services. The compensation structure of the contract therefore suggests that the contract was predominantly for goods rather than services.

Power Restoration argues that the service component of the alleged oral contract is so significant that the contract should be construed as a construction contract in which services rather than goods predominate. In support of that position, Power Restoration cites *York Heating & Ventilating Co. v. Flannery*, 87 Pa. Super. 19 (1926). In *York*, the Pennsylvania Superior Court concluded that a contract for the "furnishing and erection of a heating system for a new building" was a construction contract for services rather than a contract for the sale of goods. *Id.* at 21. The

24

Superior Court "focus[ed] its attention on the terms of the contract itself," *Cober v. Corle*, 610 A.2d 1036, 1039 (Pa. Super. Ct. 1992), which included "the usual clauses found in building contracts," *York*, 87 Pa. Super. at 21, and on the fact that "the builder had taken a wide variety of material and apparati and had assembled them into a system designed by its engineers so as to create a new and different unit, i.e. a complete heating system." *Cober* 610 A.2d at 1039. Here, in contrast, the terms of the alleged oral agreement (evidenced primarily by the proposals from Power Restoration and purchase orders from PepsiCo) includes the usual clauses found in contracts for the sale of goods rather than building contracts. For example, the purchase order issued to Power Restoration for upgrades to the Stone Mountain facility refers to payment after "FULL receipt of goods," and the Terms and Conditions relate to the "shipment of product described herein." (Am. Compl. Ex. B). Additionally, rather than assembling a "wide variety" of material into a different system, Power Restoration's primary responsibility was to install a particular configuration of the harmonic filters that were at the heart of the EPQS. The Court finds that the alleged oral contract is materially distinguishable from the contract in *York*, and is predominantly for the sale of goods.

Power Restoration's remaining claims that PepsiCo conceded that the contract was predominantly for services are unavailing. First, Power Restoration points to PepsiCo's letter terminating the outstanding purchase orders for improper installation. (*See* PRI Ex. 7). But improper installation may constitute a material breach even when the contract is primarily for goods rather than services. *See* Williston on Contracts § 26:20 (4th ed.). For example, a contract for the sale of an automobile could be materially breached if improper installation or assembly rendered the automobile incapable of performing as expected. The fact that the parties' parting of the ways can be characterized as a problem with the services provided rather than the goods tendered will not change the fact that, as a matter of law, the contract at issue is a contract for the sale of goods. Similarly, Power Restoration points to Mr. Bertz's email classifying OptiSine LLC (the company

that allegedly continued to perform the alleged oral contract after PepsiCo terminated Power Restoration) as a provider of engineering and construction services. (*See* PRI Ex. 19). But Mr. Bertz's description of OptiSine will not change the Court's application of the law to the undisputed material facts in the record before it. Those facts overwhelmingly indicate that the alleged oral contract was a contract for the sale of goods, subject to the UCC.

Upon consideration of the totality of the evidence supporting Power Restoration's claim that PepsiCo breached the alleged oral contract, the Court finds that the goods component of the contract predominated over the service component of the contract. For that reason, PepsiCo will be entitled to summary judgment on the breach-of-contract claim as it relates to the alleged oral contract, unless it falls within the scope of an exception to the Statute of Frauds.

b.      Confirmed in Writing

Under Pennsylvania law, merchants are bound by the terms of oral contracts that would otherwise be barred by the Statute of Frauds if "within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents." 13 Pa. Cons. Stat. Ann. § 2201(b). "To be a confirmation of a prior oral contract the writing needn't expressly state that it is sent in confirmation of the prior transaction, *but it must state that a binding or completed transaction has in fact been made*." *Doral Hosiery Corp. v. Sav-a-Stop, Inc.*, 377 F. Supp. 387, 389 (E.D. Pa. 1974) (emphasis added). Power Restoration argues that the Letter of Intent from Mr. Bertz confirmed the alleged oral contract because it described the scope of the contract, the price per EPQS, and the timeframe in which the installations would occur. (*See* PRI Br. 20-21). Although the Letter of Intent does not expressly reference the alleged oral contract, Power Restoration submits that it is a confirmatory writing because "all that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real

transaction." *Id.* (quoting *Harry Rubin & Sons v. Cons. Pipe Co. of Am.*, 153 A.2d 472, 476 (Pa. 1959)).

The Letter of Intent is insufficient as a matter of law to constitute a confirmatory writing because it does not state that a binding or completed transaction was ever made. The Letter announces only PepsiCo's *intent* "to procure, over the next 12 months, Power Quality Solutions to be installed at PepsiCo facilities located in multiple countries," "to conduct at least 150 audits of these facilities," and "to issue 100 Orders to PRI Global Enterprises for design and installation during this period, with an average cost of $300,000 per installation." (PRI Ex. 13). Nowhere does the Letter of Intent state that PepsiCo has *agreed* or is *obligated* to do anything. This is very different from other confirmatory writings such as, for example, a purchase order that clearly states that one party has agreed to purchase something from another. *See C.R. Fedrick, Inc. v. Borg-Warner Corp.*, 552 F.2d 852, 854-56 (9th Cir. 1977) (citing *Doral Hosiery Corp.*, 377 F. Supp. at 389) (holding that written communications describing defendant's future intent to purchase goods from plaintiff at a specific price speak of "a future intended executed agreement" and "future action" and are not sufficient to bind him to the terms of the alleged oral contract). Although the Letter of Intent is capable of serving as evidence of the oral contract's material terms, it cannot in this scenario remove the alleged oral contract from the Statute of Frauds.

c.     Specially Manufactured Goods

A contract is outside the scope of the Statute of Frauds "if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the business." 13 Pa. Cons. Stat. Ann. § 2201(b)-(c). In order for the specially-manufactured-goods exception to apply, courts generally require the plaintiff to prove that "(1) the goods were to be specially made for the buyer; (2) the goods were not suitable for sale to other persons in the ordinary course of the seller's business; (3) the seller had made a substantial beginning in the

manufacture of the goods, or if the seller is not the manufacturer, had made commitments for their procurement; and (4) such acts were performed for the buyer's contract and before notice of repudiation was received by the seller." 2 Anderson U.C.C. § 2-201:315 (3d ed.) (citing cases). Despite a "paucity of caselaw interpreting th[e] specially-manufactured-goods exception from the courts of this Commonwealth," *Company Image Knitware, Ltd. v. Mothers Work, Inc.*, 909 A.2d 324, 332 (Pa. Super. Ct. 2006), Pennsylvania courts have held that the term "specially manufactured" "refers to 'the nature of the particular goods in question,' and whether they are 'specially made for a particularly buyer, and not whether they were 'specially made' in the usual course of the seller's business." *Id.* (quoting *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1037 (5th Cir. Unit B 1982), and *Colorado Carpet Installation, Inc. v. Palermo*, 668 P.2d 1384, 1390 (Colo. 1983)). The "crucial inquiry" is "whether the manufacturer could sell the goods in the ordinary course of his business to someone other than the original buyer." *Id.* If "slight alterations" could render the goods able to be sold to a third party, then they are not specially manufactured; but if "essential changes are necessary to render the goods marketable by the seller to others," the exception will apply. *Id.*

The Court finds that the alleged oral contract here does not fall within the specially-manufactured-goods exception to the Statute of Frauds. Power Restoration argues that the EPQS were specially manufactured for PepsiCo because (1) Schaffner, one of its main suppliers, ordered filters "specifically for PepsiCo's use" at Power Restoration's request, and (2) the filters were not suitable for sale to others in the ordinary course of business. (PRI Br. 19-20). But the evidence demonstrates that the goods were suitable for sale to others in the ordinary course of business. Schaffner secured filters for PepsiCo's use after Mr. Fabrizio asked Schaffner to "place a hold on [its] inventory" for specific filters. (PRI Ex. 22). Under the circumstances of this case, the fact that Schaffner had those filters in inventory demonstrates that they are not specially manufactured, but

28

rather were suitable for sale to others in the ordinary course of business. Power Restoration points to no evidence to suggest that Schaffner would be incapable of selling those filters, or that Power Restoration would be incapable of reselling or repurposing those filters for another customer.

Additionally, the policy underlying the "specially manufactured" exception to the Statute of Frauds would not be served by applying it in this case. "The Statute exempts contracts involving 'specially manufactured' goods from the writing requirement because in these cases the very nature of the goods serves as a reliable indication that a contract was indeed formed. Where the seller has commenced or completed the manufacture of goods that conform to the special needs of a particular buyer, and thereby are not suitable for sale to others, not only is the likelihood of a perjured claim of a contract diminished, but denying enforcement to such a contract would impose substantial hardship on the aggrieved party (i.e., a seller is left with goods that are difficult or impossible to sell to others; a buyer may have difficulty locating an alternative supply of the goods)." *Impossible Elec. Techniques*, 669 F.2d at 1036-37. In this case, however, the creation of a single specially manufactured good should not be capable of taking an alleged oral contract for 100 specially manufactured goods outside the scope of the Statute of Frauds.  Where the alleged oral agreement is for 100 specially manufactured goods and plaintiff presents evidence of only a single unit that was *actually* specially manufactured, the likelihood of a perjured claim is not diminished, and there is little risk of imposing a substantial hardship on the aggrieved party because it has only performed 1% of the alleged oral agreement.

d.    Partial Performance

"Partial performance as a substitute for the required memorandum can validate the contract *only for the goods which have been accepted or for which payment has been made and accepted*." 13 Pa. Cons. Stat. Ann. § 2201(c)(3), cmt. 2 (emphasis added). Moreover, "delivery and acceptance of goods under a separate contract, independent of an alleged parol agreement, is not such part

29

performance as will take the latter out of the statute." *Brister & Koester Lumber Corp. v. Am. Lumber Corp.*, 50 A.2d 672, 677 (Pa. 1947) (citing *Scott v. Troop Water Heater Co.*, 28 A.2d 922 (Pa. 1942)). Power Restoration argues that the Statute of Frauds does not apply because it "began performance on the oral contract" by conducting audits and entering into "written purchase order contracts calling for installation of power quality systems in PepsiCo facilities located in Hayward, California and Stone Mountain, Georgia." (PRI Br. 21-22). As a matter of law, such partial performance is insufficient to remove the alleged oral contract from the Statute of Frauds. Power Restoration concedes that the EPQS installations were supported by "written purchase order contracts," (*see* Am. Compl. ¶¶ 26-27), so Power Restoration's partial performance pursuant to those contracts will not take the alleged oral contract outside the Statute of Frauds. *See Scott*, 28 A.2d at 923-24.

Additionally, under the circumstances presented in this case, the policies underlying the Statute of Frauds would not be served by applying the part-performance exception, as every written contract would be subject to claims that there existed a larger oral agreement governing the performance under a written contract. The Pennsylvania Supreme Court has made clear that part performance will only remove an alleged oral contract from the Statute of Frauds when the performance is not made pursuant to a written contract. *See Brister*, 50 A.2d at 677. Here, as the parties agree that there are written contracts (i.e., the purchase orders) covering Power Restoration's partial performance, the Statute of Frauds remains in effect notwithstanding any alleged partial performance.

Similarly, Power Restoration's performance of energy audits does not save its claim from summary judgment because no goods were accepted in connection with the energy audits. Because the partial-performance exception "can validate the contract *only for the goods which have been accepted or for which payment has been made and accepted*," 13 Pa. Cons. Stat. Ann. § 2201(c)(3),

30

cmt. 2 (emphasis added), the completion of energy audits will not take the alleged oral contract outside the Statute of Frauds.

\*     \*     \*

The Court finds that the alleged oral contract falls within the Statute of Frauds, but without the enumerated exceptions. Therefore, PepsiCo is entitled to summary judgment on Power Restoration's claim for breach of the alleged oral contract.[16]

B.    GREGORY JENNINGS' MOTION FOR SUMMARY JUDGMENT

Pepsico, as Third Party Plaintiffs, assert 6 claims against Mr. Jennings: (1) fraudulent inducement; (2) fraud; (3) civil conspiracy to commit fraud; (4) negligent misrepresentation; (5) aiding and abetting a breach of fiduciary duty; and (6) contribution. Mr. Jennings filed a Motion for Summary Judgment, arguing that the Third Party Plaintiffs have produced no evidence that he misrepresented Power Restoration's size and capabilities in a way that induced PepsiCo to enter the alleged oral contract, and no evidence that Messrs. Mazzoli and Bertz had a financial interest in Power Restoration. For the following reasons, the Court will deny Mr. Jennings' Motion.

Four of the six claims that PepsiCo asserts against Mr. Jennings have, as an element, some sort of misrepresentation. Fraudulent inducement,[17] fraud,[18] civil conspiracy to commit fraud,[19] and

---

[16] Because the Statute of Frauds will bar Power Restoration's claim for breach of the alleged oral contract, the Court need not address PepsiCo's argument that the terms of the alleged oral contract were too indefinite for the claim to get to a jury. However, the Court notes that Power Restoration has failed to point to much (if any) evidence that the material terms were agreed to in August 2010. Power Restoration relies on testimony and affidavits from individuals who claim they were present when the alleged oral contract was formed, but there is a notable dearth of testimony establishing that the material terms were discussed and agreed to at that time. To the extent Power Restoration relies on other evidence to establish the material terms of the alleged oral agreement, there is little (if any) evidence from which a reasonable jury could find that those terms were agreed to in August 2010.

[17] *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 275-76 (3d Cir. 2010) (citing *Skurnowicz v. Lucci*, 798 A.2d 788, 792 (Pa. Super. Ct. 2002)) (stating the elements of fraudulent inducement to be "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the

negligent misrepresentation[20] each require the plaintiff to prove that the defendant made a misrepresentation that led to an injury. Mr. Jennings argues that PepsiCo has failed to produce any evidence that Mr. Jennings misrepresented PRI's size and capabilities and thereby caused PepsiCo to contract with Power Restoration.

However, PepsiCo points to a number of statements in the record by Mr. Jennings that it claims are actionable misrepresentations or material omissions. *See, e.g.*, PepsiCo's Response Br. ¶¶ 2-3 ("We are able, in most cases, to offer a 18 month return on investment to our customers in the food and beverage industry," when PRI had no customers); *id.* at ¶ 4 (representing in February 2012 that Power Restoration had a track record of success when Power Restoration admits that it never had any other clients); *id.* at ¶ 5 (representing that Power Restoration had a global capability for audits and installations when only 4 people worked for Power Restoration). Moreover, because PepsiCo's Third Party Complaint (Docket No. 42) alleges that Mr. Jennings, among others, made misrepresentations that induced PepsiCo into *a business relationship* with Power Restoration, PepsiCo's claims are not limited to misrepresentations that allegedly induced PepsiCo to form the alleged oral contract. As a result, even alleged misrepresentations made after August 2010 are

intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance").

[18] *See Agathos v. Starlite Motel*, 977 F.2d 1500, 1508 (3d Cir. 1992) (describing the elements of fraud under Pennsylvania law as "(1) a material factual representation; (2) made with knowledge or belief of its falsity; (3) with the intention that the other party rely thereon; (4) resulting in justifiable reliance to that party to his detriment").

[19] *See Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. Ct. 2004) (describing the elements of civil conspiracy to commit fraud as "(1) a combination of two or more persons acting with a common purpose to do an unlawful act by unlawful means for an unlawful purpose; (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage"). Mr. Jennings identified the alleged misrepresentations as the "unlawful act by unlawful means" alleged by PepsiCo.

[20] *See City of Rome v. Glanton*, 958 F. Supp. 1026 (E.D. Pa. 1997) (describing the elements of negligent misrepresentation as "1) a misrepresentation of a material fact; 2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity, or must make the representation under the circumstances in which he ought to have known its falsity; 3) the representor must intend the representation to induce another to act on it; [and] 4) injury must result to the party acting in justifiable reliance on the misrepresentation").

sufficient for PepsiCo's third party claims against Mr. Jennings to survive summary judgment. Because PepsiCo has produced such evidence, the Court will deny Mr. Jennings' Motion for Summary Judgment.

To succeed on the aiding and abetting claim, PepsiCo must prove that (1) Mr. Bertz breached a fiduciary duty owed to PepsiCo; (2) Mr. Jennings knew about Mr. Bertz's breach; and (3) Mr. Jennings rendered substantial assistance or encouragement to Mr. Bertz. *See Pierce v. Rossetta Corp.*, No. 88-5873, 1992 WL 165817 (E.D. Pa. June 12, 1992). Mr. Jennings also moves for summary judgment on PepsiCo's claim for aiding and abetting a breach of fiduciary duty, arguing that there is no evidence that he was aware that Mr. Bertz breached a fiduciary duty to PepsiCo. PepsiCo points to Mr. Jennings' deposition, in which he admitted knowing that as "part of Pepsi's compliance agreement, [Mr. Bertz] can't be part of any other board." (Jennings Dep. 101-02). Additionally, although Mr. Jennings contends that the evidence shows he did not give Mr. Bertz a percentage ownership in Power Restoration while he was employed by PepsiCo, PepsiCo has presented sufficient circumstantial evidence that Mr. Bertz (or his entity Dark Wing LLC) was receiving compensation from Power Restoration while he was employed at PepsiCo. (*See* PepsiCo's Response Br. 16-17). Mr. Jennings has advanced one particular reading of the evidence, and PepsiCo has advanced another. This is precisely the type of question that a factfinder must decide.

Given that other claims against Mr. Jennings will survive summary judgment, so too will the claim for contribution. Mr. Jennings Motion for Summary Judgment is therefore denied in its entirety.

## IV.   CONCLUSION

Because there is a critical gap in the record on summary judgment that prevents a finder of fact from determining the amount of lost profits with the requisite degree of certainty, and the Statute of Frauds bars a claim for nominal damages for breach of the alleged oral contract,

PepsiCo's Motion for Summary Judgment is granted. Because PepsiCo has presented sufficient evidence that Mr. Jennings misrepresented critical facts regarding Power Restoration and that Mr. Bertz may have received compensation from Power Restoration while working for PepsiCo, Mr. Jennings' Motion for Summary Judgment is denied.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE